## JONES *v.* HOLLADAY.

CONTRACTS TO SELL REAL ESTATE; REAL ESTATE AGENTS; SPECIFIC
PERFORMANCE; TRUSTEES.

1. Authority to a real estate agent to sell real estate does not include
the power to make a contract to sell which will bind the owner;
such power must be given by express grant, or by certain impli-
cation from the words used ; *following* Mannix *v.* Hildreth, *ante*,
p. 259.

2. A real estate agent earns his commission upon procuring a *bona fide*
offer at his principal's price and upon his terms, from one able
and willing to complete the purchase; *following* Mannix *v.*
Hildreth, Id.

3. Authority to a real estate agent by his principal to contract for the
sale of real estate will not authorize the agent to make a con-
tract for the sale of an option to purchase the real estate.

4. A person who seeks to purchase real estate from a trustee who is
acting by a real estate agent, is bound to inquire as well into the
powers and duties of the trustee as into the authority possessed
by the agent.

5. Equity will never decree specific performance of a contract for the
sale of real estate made by a trustee, against the trustee, when
it is not clearly shown that the purchase price is equal to, or
greater than the value of the property.

No. 152.   Submitted December 11, 1893.—Decided February 5, 1894.

HEARING on an appeal by the complainant from a decree
of the Supreme Court of the District of Columbia, holding
an equity term, dismissing a bill for specific performance.
*Affirmed.*

The COURT in its opinion stated the case as follows:

The bill in this case was filed by Laura E. Jones in the
Supreme Court of the District of Columbia, December 19,
1889, against Jesse Holladay, trustee, to compel the per-
formance of the following contract for the sale of square
862 in the city of Washington:

"This agreement made this thirty-first day of October,
A. D. 1889, between Ivory G. Kimball of Washington city,
District of Columbia, attorney and duly authorized agent of
Jesse Holladay, trustee, of the first part, and James J. Ryon,

agent of Laura E. Jones, of the same place, of the second part. Witnesseth, that the said party of the first part has this day sold to the said party of the second part all of square numbered eight hundred and sixty-two at and for the sum of thirty-five cents per square foot, to be paid for as follows, viz.: forty thousand dollars of the purchase money to be paid in cash on or before the first day of January A. D. 1890, and the balance of the purchase money to be paid in two equal instalments, in one and two years after date, with interest on said deferred payments at the rate of six per centum per annum, said interest payable in semi-annual instalments, and said deferred payments and interest thereon to be secured by a deed of trust on said square to be given when said forty thousand dollars is paid and a good deed in fee simple conveying a perfect and unencumbered title to said square is executed and delivered by the said Jesse Holladay, trustee, to the said Laura E. Jones and her heirs. The said square being situate in the city of Washington, District of Columbia. And the said party of the first part does hereby acknowledge the receipt from the said party of the second part of the sum of five hundred dollars in part payment of the cash payment of forty thousand dollars aforesaid, and in consideration thereof and of the performance by the said Laura E. Jones and her heirs of the terms of this agreement by her and them to be performed, does hereby bind the said Jesse Holladay, trustee, to the faithful performance of the terms of this agreement so far as they relate to him. And it is understood and agreed by and between the parties hereto that the terms of this agreement are to be fully complied with by the said Holladay and Jones, so far as they relate to them respectively, by the first day of January A. D. 1890, and that the title to said land to be conveyed as aforesaid to the said Jones and her heirs, by the said Holladay, trustee, is to be a perfect and unencumbered title, and that if the said Jones fails to comply with her part of this agreement by the first day of January A. D. 1890, that the said five hundred dollars is to be forfeited, and this agreement to be null and void.

" In witness whereof the parties of the first and second parts have hereunto set their hands and seals this thirty-first day of October, A. D. 1889.

"IVORY G. KIMBALL,          [SEAL.]
    "*Att'y and Agent for Jesse Holladay.*
    " JAS. P. RYON, *Agent.*      [SEAL.]
"Signed, sealed and delivered in presence of A. K. PARRIS."

This instrument was acknowledged on its date and filed for record November 11, 1889.

The square formerly belonged to George W. Ewing and his brother, William G. Ewing, both of whom were then dead. George W. Ewing died testate, in Indiana in May, 1866. His will, which seems to have been probated both in Indiana and Illinois, disposed of a very large estate to trustees, who were directed to hold, manage, sell, invest and reinvest the same upon certain trusts for the benefit of certain of his children. The will provided that no sale should be made unless an appraisement should first have been made, and then for not less than two-thirds of such appraised value. The trustees named in the will resigned, and on June 26, 1876, Jesse Holladay was appointed trustee in their stead by the Circuit Court of Cook county, Illinois, and vested with all the powers of the original trustees as set out in the will. The will was inoperative in the District of Columbia because not attested in the manner required by the laws thereof.

Inasmuch as the trustee could not dispose of the real property in the District, which consisted of other lots as well as that in controversy, a suit was filed in the Supreme Court of the District by one Sturgis, who was one of the heirs of William G. Ewing, to which all the heirs of said William G. Ewing and George W. Ewing were made parties defendant, for the purpose of selling the lot and distributing the proceeds thereof. Under the decree of sale Jesse Holladay purchased the property for the benefit of the estate of George W. Ewing. This was confirmed October 23, 1882, and a deed was made to him as if in his own right   In order to

declare the trust for the estate, he made a deed to one Peck, who on February 4, 1884, reconveyed the property to him as " trustee for the estate of George W. Ewing, deceased." This conveyance gives full power of sale to the said trustee, but does not set out the trusts of the will, nor refer thereto other than as may be inferred from the description of Holladay as trustee for the estate.

Holladay held the property from that time as under the trusts of the will, and made reports concerning it to the court under which he held his appointment.  I. G. Kimball was the attorney who procured the decree of sale in the aforesaid proceedings.  He acted as agent for the sale of the property and made attempts to sell, as the correspondence between him and Holladay from 1884 to October, 1889, will show.

James P. Ryon also acted as agent, or broker for sale, at one time, and was familiar with the title and trusts under which Holladay held, or claimed to hold.  Kimball was, of course, familiar with the title and trusts also, and was, in the course of the correspondence, reminded of the requirement concerning appraisement before sale.  It is not necessary to state the correspondence between the parties prior to October 14, 1889, on which date Holladay wrote a letter to Kimball in response to an inquiry made by him, in which he says: " The improvement of the streets near the square will add greatly to its value, and my price now is 35 cts. per square foot.  If you want to sell it I will give you a reasonable time in which to do so.  I shall be glad to hear from you on the receipt of this."  Kimball replied October 23, suggesting difficulties in the way of speedy sale, asking for a year, if possible, within which to sell, and concluding thus: " What terms will you give?"  To this, under date of October 26, Holladay made reply as follows:

" I have yours of the 23d.  I could not give you a year to sell the square.  If you wish, you can have until the 15th day of January, 1890.  Other parties would be glad to have the selling of it for that time.  It may be that those en-

gaged in the real estate business exclusively can negotiate a sale in less time than you can. My price is thirty-five cents (35c.) per square foot; forty thousand cash and the balance in one and two years, with 6 per cent. interest. I will allow you (2) two per cent. commission for your services if the sale is consummated, but no consideration whatever unless the property is sold and money paid. Telegraph reply, as I wish to make other arrangements if you decide not to accept my proposition."

Responding to this, Kimball telegraphed Holladay, October 29, " I accept terms letter twenty-sixth. Have already taken steps." During this correspondence, Kimball was negotiating with Ryon, and on October 31 entered into the agreement with him above set forth. The purchase was not made for Mrs. Jones, but for a " syndicate " which Ryon had formed. Mrs. Jones had little or no means, and is the sister of Ryon, who had frequently used her name in his real estate deals. The deposit of five hundred dollars was advanced by Ryon and a member of the " syndicate." On the day the contract was signed Kimball wrote to Holladay as follows:

" I have been exceedingly fortunate in my attempt to sell Sq. 862. As soon as I received your letter of the 14th inst. I went to work at it and have just received a deposit of $500 to bind the bargain. It will, of course, take some time to close it out, but he is in hopes to have everything ready by Dec. 1st, but it may take a little longer. The sale was made at 35 cts. per square foot, $40,000 cash, bal. in one and two years, with interest at six per cent. per annum, payable semi-annually, secured by deed of trust on the square, or, in other words, the terms are exactly what you authorized me to sell for. If the purchaser desires to have the notes read ' on or before one (or two) years after date,' so that they can pay before maturity, would you object? Do you want an appraisement made? I will let you know when the purchaser is ready to close, and will send you a deed. Will you be able to come on when it is ready for closing, or will you

want me to send you N. Y. drafts for the amount? I have just discovered something not so pleasant, to wit, that in 1885 there was assessed against this property a water-main tax of $2,758.34, which runs at ten per cent. per annum, interest from Sept. 15, 1885, and that in 1887 this square of ground was advertised to be sold on account of the non-payment of this tax. What do you want done about it? I send bill for this tax. I can pay it out of the purchase money or you can send the money with which to pay it."

In addition to the written agreement aforesaid, Kimball, on the same day, executed and delivered to Ryon the following receipt:

"October 31st, 1889.

"Received of J. P. Ryon, attorney for Laura E. Jones, five hundred (500) dollars to bind the bargain on her purchase of all of square 862, in the city of Washington, containing 220,667 square feet of ground, at thirty-five (35) cents per square foot, the payments to be made forty thousand dollars ($40,000) cash and the balance in two (2) equal instalments, payable in one and two (1 & 2) years after date, with interest at six (6) per cent. per annum, payable semi-annually; the title to be perfect and taxes to be paid up to date; sale to be consummated on or before January 1st, 1890, or the deposit to be forfeited.

"I. G. KIMBALL,
"*Attorney for Jesse Holladay, Trustee.*"

No copies of these papers were sent to Holladay. November 1, Holladay, not having then received Kimball's letter of October 31, wrote him as follows: "Your telegram of the 29th ult., stating that you accept the terms as per my letter of the 26th ult., is received. In the above-mentioned letter I neglected to say that before I can sell the square it must be appraised in accordance with Col. Ewing's will, a fact with which you are already acquainted."

On November 6 Holladay wrote as follows to Kimball: "Yours of 31st ult. and telegram of the 5th inst. are re-

ceived. In reply, will state that my proposition was made in entire ignorance of the existence · of the tax for water-mains, and supposing that the estate would receive the full consideration. Inasmuch as I cannot convey the property without the consent of the heirs, and the order of the court, the purchase will have to be abandoned, as it is useless to attempt to get the necessary consent and order. Our whole correspondence shows that we expected the purchaser to pay the water tax."

Several letters were written by Kimball after this to Holladay, in which he insisted upon compliance by him and the payment of his commission. To these Holladay made only one reply, on November 12, as follows: " Yours of 9th received. I have nothing further to add to my letter of the 6th."

On November 11, Kimball had two real estate brokers to examine the property, and they made oath that " the said square, in the condition it is now in—very much above grade—is worth as an entirety 35 cents per square foot." Each made his affidavit separately, but both are alike, word for word. Ryon tendered performance of his contract in strict accord with its terms and demanded his deed.

It appears from the proof, that the " syndicate " was to take the property at about 39 cents per square foot, and that it was probably worth more. Its value increased considerably pending the suit.

Upon the hearing, the court below passed a decree dismissing the bill, from which this appeal has been duly prosecuted.

*Mr. J. J. Darlington* and *Mr. Henry E. Davis* for the appellant:

That authority to sell carries the power in case of sale, to execute a proper note or memorandum under the statute of frauds, cannot be successfully questioned. The text-books are sufficient for this. " Every authority carries incidentally all the power necessary for its execution." Story on

Agency, Ch. 6, Secs. 58, 60, 73, 85, 97. "Authority to sell land is power to make necessary papers, unless there is a limit to the mere finding a purchaser." Mechem on Agency (1889), Sec. 321. Chief Justice Shaw: "When the term sale is used in its ordinary sense, and the tenor and effect is to confer on the attorney power to dispose of real estate, the authority to execute the proper instrument required by law to carry such sale into effect, is a necessary incident." *Valentine* v. *Piper*, 22 Pick., 85; *Magruder* v. *Peter*, 4 Gill & J., 323; *Magruder* v. *Peter*, 11 Id., 217; *Alexander* v. *Walter*, 8 Gill, 239. In *Lyon* v. *Pollock*, 99 U. S., 688, under a general power to sell *all* the principal's property, a sale of land was made and a deed given. Held, that the deed was executed without power, but was good as a contract to sell, and bound the owner. There are many more cases. This case is distinguishable from *Hamilton* v. *Cutts*, 6 Mackey, 208, and *Ryon* v. *Magee*, 2 Id., 17. Kimball was not a broker, and the authority to him was special and precise.

*Mr. J. H. Lichliter, Mr. Job Barnard* and *Mrs. E. S. Mussey* for the appellee:

A general authority to an agent to sell real estate is simply an authority to find a purchaser, and is not an authority to conclude and execute a contract of sale which shall bind the principal. *Ryon* v. *McGee*, 2 Mackey, 17, 21; *Hamilton* v. *Cutts*, 6 Mackey, 208; *Grant* v. *Ede*, 85 Cal., 418; *Armstrong* v. *Lowe*, 76 Cal., 616; *Duffy* v. *Hobson*, 40 Cal., 240; *Kramer* v. *Blair*, 88 Va., 456, 463; *Simmons* v. *Kramer*, 88 Va., 411; *Blair* v. *Sheridan*, 86 Va., 527; *Morris* v. *Ruddy*, 20 N. J. Eq., 236; *Carstens* v. *McReavy*, 25 Pacific Rep., 471; *Malone* v. *McCullough*, 24 Pacific Rep., 1040. The cases above cited present this question in suits brought by both alleged vendors and alleged vendees; some for specific performance of contracts and others for damages for breach of contracts; and they show varied facts and circumstances, and most of them furnish parallels and illustrations, in different particulars, of the case at bar.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. Strictly construed as it must be, the letter of Holladay to Kimball of October 26, 1889, did not authorize him to enter into the contract with Ryon. The power conferred upon Kimball was that of a broker simply to " negotiate a sale." We have held in the case of *Mannix* v. *Hildreth*, (*ante*, p. 259), that mere authority to a real estate agent, or broker, to sell does not carry with it the implied power to make a contract for sale, upon the owner's terms, that will bind him. Such authority must be given by express grant, or by certain implication from the words used. The reason for applying the rule in this case is stronger than in that.

Here Holladay was a trustee and bound to act for the best interest of those whom he represented. While this property did not pass by the will, it was the intention of the testator that it should, an intention which only failed because of the omission to have his signature attested by three witnesses as required by the law of the District of Columbia.

To cure this the sale of the property was procured. Holladay bought it in for the estate of Ewing, and then caused the title to be vested in himself as trustee therefor, and always treated it as held under the same trusts provided in the will. These proceedings, we think, had the effect, so far as Holladay was concerned, to subject the property to the said trusts; he at least would have been estopped to deny it.

His requirement, then, and previously insisted upon, that the appraisement should be made as provided in the will, before concluding a sale, shows clearly that he did not contemplate conferring on Kimball the power to enter into a binding contract of sale with any purchaser he might find.

Possibly, as has been suggested, Kimball's anxiety to fix his right to the commission may have influenced his action to some extent. But if so, he need not have gone as far as he did. By procuring a *bona fide* offer on Holladay's terms, from one able and willing to complete the purchase, his right to compensation would have been as well fixed as it could be under a contract of sale, and far better than under

the instrument which he did make. This instrument is not a mutual contract of purchase and sale. It is nothing more than the sale of an option, running the unreasonable period of two months and a half, to purchase property worth $80,000.00 upon a forfeit of $500.00 if not exercised within that time.

Suppose that Holladay had ratified this contract, and the other parties had declined to complete the purchase, what would have become of Kimball's claim to a commission? If it were conceded that the authority given Kimball to sell included the power to make a contract of sale upon Holladay's terms, this instrument could not ·be in execution thereof. The power to contract for the sale of a lot does not authorize a contract for the sale of an option. *Coleman* v. *Garrigues*, 18 Barb., 60 ; *Jackson* v. *Badger*, 35 Minn., 52.

2. The property being held under the trusts of the will by Holladay, it was proper that he should require an appraisement as prerequisite to any sale. Kimball in his letters expressed the opinion that the property was not subject to the trusts of the will; but he well knew from letters of Holladay, long prior to this transaction, that, he at least, considered himself bound thereby in dealing with it.

Ryon also had knowledge of the title under which Holladay held, and claimed to hold. He was bound, too, to inquire into his powers and duties as trustee as well as into the authority possessed by Kimball.

His knowledge and the duty of inquiry imposed upon him bind his principal, whether nominal or real, as fully as they would him if he had acted directly on his own behalf.

The appraisement of Stickney and Harding was procured by Kimball not only after the contract was made, but also after notice from Holladay repudiating it and denying his authority.

Evidently it was not made in good faith to comply with the terms of the trust; but for the sole purpose of strengthening the case of the " syndicate " and of Ryon, who stood behind the name of the pretended purchaser.

3. Even if Holladay had conferred full power upon Kimball to make this contract, and then refused to perform it, because he might have discovered that the property was really worth more and ought to be sold for more, there would still remain an insuperable obstacle to a decree of specific performance. Holladay is not the beneficial owner of the property. He holds it for the estate of George W. Ewing, of which he is the trustee under the appointment of a court of another jurisdiction.

It is questionable if a court of equity ought ever to decree specific performance of a contract of sale made by a trustee of this kind.

If ratified by the *cestui que trust,* laboring under no disability at the time, or clearly proved to be to his interest, it would seem that performance might be decreed; nor will we now say that there are not other instances in which it might be done.

However this may be, it will never be decreed where the purchase price is not clearly shown to be equal to, or greater than, the value of the property.

He who contracts with a trustee must do so at this risk.

The testimony in this case shows that the property was worth something more than the price contracted for at the time, and that it increased in value before and after the institution of the suit.

*From what has been said it follows that the decree appealed from must be affirmed with costs to the appellee ; and it is so ordered.*